UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| GENESIS STRATEGIES, INC., | ) | |
| Plaintiff | ) | |
| v. | ) | CIVIL ACTION |
|  | ) | NO. 11-12270-TSH |
| PITNEY BOWES, INC., and ICSN, INC., | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION ON DEFENDANTS PITNEY BOWES, INC. AND ICSN, INC.'S MOTION FOR SUMMARY JUDGMENT (Docket No. 54)
**May 16, 2014**

HILLMAN, D.J.

### Introduction

Plaintiff Genesis Strategies ("Genesis" or "Plaintiff") filed a complaint against Pitney Bowes, Inc. ("Pitney Bowes") and ICSN, Inc. ("ICSN") (collectively "Defendants") seeking monetary damages from Pitney Bowes for trade dress infringement (Count I), violation of M.G.L. c. 93A sec. 11 (Count II), and fraudulent misrepresentation (Count V); and from ICSN for trade dress infringement (Count III), and unfair trade practices in violation of M.G.L. c. 93A sec. 11 (Count IV). Defendants have moved for summary judgment on all counts. For the reasons set forth below, the motion is granted in part and denied in part.

### Facts

Genesis is an aftermarket retailer that sells styluses, stylus pens, and stylus holders through various websites. In January 2006, Genesis' President, James Boudreau ("Boudreau"),

1

created the stylus holder at issue in this litigation. The new stylus holder had three unique features: 1) an oval-shaped backplate; 2) a wineglass shape; and 3) a curved spine.

Between August 2009 and October 2009, Pitney Bowes and Plaintiff engaged in discussions regarding purchasing stylus holders. Plaintiff contends that Pitney Bowes represented that it would order from the Plaintiff between 15,000 and 18,000 units a year from Pitney Bowes, for the next three years, at a price of about $7 per holder.

On February 11, 2010, Pitney Bowes ordered fifty stylus holders online from Plaintiff. On that same date, Ryan Maddern, a product manager at Pitney Bowes, emailed Ezra Shim from ICSN asking him to source a stylus holder "similar to" Plaintiff's stylus holder. Ezra Shim then emailed Arbil Cai, another ICSN employee, among others, informing them of the need to source the stylus holder for Pitney Bowes. In March 2010, Pitney Bowes ordered 5,278 stylus holders from Plaintiff. On March 8, 2010, Kevin Lee from ICSN emailed Kevin Ko, also from ICSN, stating that ICSN had probably found a manufacturer who could produce the requested stylus holder.

After going back and forth with the potential manufacturer regarding the exact details, the manufacturer emailed Kevin Ko on March 12, 2010 with a request for a "custom sample to avoid any mistakes." On March 15, 2010, the manufacturer ordered two stylus holders from Plaintiff, from which they made a mold to create their own stylus holders. Thereafter, Pitney Bowes ordered stylus holders from ICSN at around $1.50 per holder and placed no further orders with Plaintiff.

## Discussion

*Standard of Review*

Summary judgment is appropriate when "there is no genuine issue as to any material

fact" and thus "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir.1994). The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1968). It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. U.S.,* 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 4). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex,* 477 U.S. at 325). When ruling on a motion for summary judgment, the court must construe the facts in the light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003).

*Trade Dress Infringement (Counts I & III)*

The Lanham Act provides protection for trade dress, 15 U.S.C. § 1125a, which is defined by the courts as "the design and appearance of a product together with the elements making up the overall image that serves to identify the product presented to the consumer." *Yankee Candle v. Bridgewater Candle,* 259 F.3d 25, 37 (1st Cir. 2001). In order for trade dress to be protected under the Lanham Act, a plaintiff must prove that the trade dress was used in commerce, is non-functional, and is distinctive. *Id*.

1. Use in Commerce

Neither party disputes that the product design for which Plaintiff is seeking protection

3

was used in commerce.

2. Functionality

In order to receive protection, a trade dress must be non-functional. *I.P. Lund Trading v. Kohler*, 163 F.3d. 27, 36 (1st Cir. 1998). The burden of proving non-functionality rests on the party seeking protection. *Id.* at 37–38. Functionality can be achieved through the determination that either the design was essential to the use or purpose of the device, or that the design affects the cost or quality of the device. *TrafFix Devices v. Marketing Displays*, 532 U.S. 23. 31–34 (2001). The fact that the trade dress contains elements that are functional does not preclude protection under the Lanham Act if the combination of all the elements is not functional. *I.P. Lund,* 163 F.3d. at 38.

Plaintiff claims entitlement to trade dress protection for three features of its stylus: the "wineglass" shape, the oval-shaped backplate, and the curved spine of the holder. Plaintiff asserts both a functional and a non-functional use for each of these three features.

*a. Wineglass Shape*

For the wineglass shape, Plaintiff explains that the holder must be narrower at the bottom than at the top so that stylus does not "flop around a lot." They also note that from a design standpoint, the wineglass shape is "more pleasing to the eye" than other stylus holders, and that it designed its holder at the request of customers who were seeking a product more pleasing to the eye. Plaintiff alleges that the inside of the stylus holder is functional, but the wineglass shape on the outside is designed for aesthetic purposes only.[1] While Defendants assert that comparing the

---

[1] Defendants contend that Plaintiff is trying to change its statements in response to Defendants' motion for summary judgment, and that these statements should not be allowed under *Abreu-Guzman v. Ford.* 241 F.3d. 69 (1st Cir. 2001). *Abreu-Guzman* holds that a party opposing summary judgment cannot change his earlier sworn testimony in response to a motion for summary judgment without a satisfactory explanation. The First Circuit previously held that "when an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but doesn't give a satisfactory explanation to why the answer has changed." *Colantuori v. Alfred Calcagni & Sons,* 44 F.3d. 1, 4–5 (1st Cir. 1994). Boudreau, in

4

outside and the inside of the stylus holder is "nonsensical," there is evidence on the record that a stylus holder can be narrower at the bottom and wider at the top without a wineglass shape on the outside. The wineglass shape on the outside does not affect the essential use of the stylus holder or the cost or quality of the stylus holder. Therefore, Plaintiff has raised a question of fact regarding the functionality of the wineglass shape.

*b. Oval-Shaped Backplate*

Boudreau notes in his deposition that at the time he designed his stylus holder, there was another stylus holder already on the market which was "square, blocky, and egalitarian." He states that he created his own holder to be more "cosmetically pleasing since it was going to be in commercial and retail environments." He created a backplate that had more "curves and round features" and increased the size of the backplate in order to obtain a greater amount of surface area for screw holes and to make it easier to attach the stylus holder to a surface. Plaintiff therefore asserts both functional and non-functional uses for the enlarged backplate with an oval shape.

While the enlarged surface is certainly a functional aspect of Plaintiff's stylus holder, there is nothing to indicate that the oval shape itself is functional. An oval shape does not make the product more efficient, nor does it affect the cost or quality of the holder. Therefore, the question of functionality in regards to the oval-shaped backplate should be submitted to a fact finder.

*c. Curved Spine*

Plaintiff does attribute a functional aspect to the curved spine. The spine has the ability

---

his deposition, when asked about functionality stated "[o]n the inside, most styluses are going to be somewhat smaller at the bottom....", and he often refers to aesthetic reasons for the final design of the product, especially the outside of the product. His affidavit does not contain clearly contradictory answers to unambiguous questions, and his statements may be evaluated in response to the wineglass shape.

to hide the tether, which is not a feature on other stylus holders. Plaintiff claims, however, that hiding the tether is for aesthetic reasons. This raises a question of fact as to the functionality of the curved spine.

*d. Overall Design*

While there may be some functional aspects of the design, the Court needs to determine if the overall design is functional. Plaintiff relies on *I.P. Lund Trading* which held that a design can still be protected under trade dress when it contains functional features, so long as the combination of the features is not functional. 163 F.3d at 37.[2] Defendants rely on *Wal-Mart v. Samara Brothers*, which determined that trade dress can never be inherently distinctive; rather the trade dress holder must show secondary meaning. 529 U.S. 205 (2000). The holding, however, does not go to the functionality of the trade dress, but rather to the third element, distinctiveness. Defendants also quote a Massachusetts District Court case which states that when "*all* the component parts of a product design are functional, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional." *Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 134 (D. Mass. 2003) (internal quotations omitted). Since Defendant has not shown that all of the component parts of the product design are functional, Plaintiff has demonstrated there is a question of fact as to the functionality of the overall design.

3. Distinctiveness

A trademark can be distinctive either through inherent distinctiveness or by attaining secondary meaning. *See Chrylser Corp. v. Silva*, 118 F.3d. 56, 58 (1st Cir. 1997). The Supreme

---

[2] Defendants erroneously state that Plaintiff is relying on *Taco Cabana Int'l, Inc. v. Two Pesos*, *Inc.* Rather Plaintiff quotes *IP Lund*, a First Circuit case that quotes the Fifth Circuit decision in *Taco Cabana*. *See* 163. F.3d at 37 (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc*., 932 F.2d 1113, 1119 (5th Cir.1991), aff'd, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

Court in *Wal-Mart v. Samara Brothers* held that a trade dress can almost never be inherently distinctive, and thus the burden is on the party asserting the mark to show secondary meaning. 529 U.S. at 212–14 ("it seems to us that design, like color is not inherently distinctive"). "Secondary meaning occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" *Id*. at 211 (quoting *Inwood Laboratoies, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851, n. 1, 102 S.Ct. 2182, 72 (1982)). "A mark has secondary meaning when enough of the consuming public uses the mark to identify the source of the product or service." *Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab., Inc.*, CIV.A. 11-12192-WGY, 2014 WL 644736 (D. Mass. Feb. 19, 2014).

Secondary meaning is generally a question of fact. *Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co., Inc.*, 9 F.3d. 175, 180 (1st Cir. 1993). "Proof of secondary meaning entails vigorous evidentiary requirements." *Id*. Secondary meaning can be established either through direct evidence or indirect (circumstantial) evidence. *Yankee Candle v. Bridgewater Candle Co.,* 259 F.3d. 25, 43 (1st Cir. 2001).

    *a. Direct Evidence*

In *Yankee Candle*, the First Circuit determined that the only direct evidence for secondary meaning is a consumer survey. 259 F.3d at 43. Plaintiff commissioned a consumer survey, which Defendant contends is inadequate to show secondary meaning.

The Court can determine that a consumer survey is so deficient that no reasonable jury could conclude that it demonstrates secondary meaning. *See Bay State Sav. Bank v. Baystate Financial Services*, 484 F.Supp.2d. 205 (D. Mass. 20007). In *Bay State Sav. Bank*, the Court found that the consumer survey's insufficient phrasing of the survey questions indicated only that "a portion of respondents associated the words 'Bay State' with 'Bay State Savings Bank," not

7

that the name was associated with providing investment or insurance services. *Id*. at 217. The Court also noted that the number of respondents who associated the name "Bay State" with the plaintiff was not high enough, as "[c]ourts typically view survey evidence indicating that 50% or more of the consuming public associate a mark with the company's products as sufficient to demonstrate secondary meaning." *Id*.; *see also Yankee Spirits, Inc. v. Gasbarro*, 1998 WL 428092 (D. Mass. 1998) ("often, consumer recognition below 25% fails to establish secondary meaning.").[3] In *Carroll Shelby Licensing, Inc. v. Superformance Int'l., Inc*, the Court found a consumer survey insufficient to establish secondary meaning because it failed to "prove that the primary significance of the Cobra shape in the minds of consumers is to identify [Plaintiff] as the *single producer*;" instead, consumers associated the Cobra shape with numerous different names. 251 F. Supp. 2d 983, 986-87 (D. Mass. 2002). Finally, in *Straumann v. Lifecore Biomedical Inc.*, the Court evaluated the survey question "*What company* do you think puts out these products? If you do not know, please feel free to say so." and found that the survey failed partially because the "questions presume the existence of the key element in the secondary meaning inquiry, mainly the association of the design with a single source." 278 F.Supp.2d. 130, 138 (D. Mass 2003).

David Schneer ("Schneer") organized and conducted the consumer survey for Plaintiff. However, Schneer was unsure if the survey addressed secondary meaning because he did not

---

[3] In *Yankee Spirits*, the Court found that a survey demonstrating that 29% of survey participants, who were located within an eight mile radius of the store, had heard of "Yankee Spirits" within one month of the opening of the store was sufficient to demonstrate secondary meaning when taken in conjunction with the indirect evidence, which included Yankee Spirits' substantial efforts to establish the mark over a period of thirty-three years. *Yankee Spirits, Inc. v. Gasbarro*, 1998 WL 428092 (D. Mass. 1998). In *Beacon Mut. Ins. Co. v. OneBeacon Ins. Corp.*, the Court found that a survey that concluded that "69% of respondents who heard and 79% of respondents who saw the term 'The Beacon' said it signified a worker's compensation insurance company" supported the conclusion that Beacon Mutual had acquired secondary meaning. 375 F.Supp.2d. 251, 257 (2005).

know what it was. Schneer stated that he was hired to conduct a survey to assess the level of confusion amongst the customers.[4]

The survey consisted of eight multiple choice questions. It begins by showing the individual taking the survey a photo of the Plaintiff's product and then showing two more photos, one of Defendant's product and another of a separate stylus holder, and asking the individual which product more closely resembles Plaintiff's product. This question addresses likelihood of confusion rather than secondary meaning, as it does not show how an individual would relate Plaintiff's stylus holder to Plaintiff.

Of the eight multiple choice questions, only two could arguably relate to secondary meaning. These ask "Prior to taking this survey, had you seen the product pictured below?" and, if yes, "Where have you seen this product?" The second question supplied nine multiple choice answers, three of which are websites controlled by Plaintiff. This question can show only that existing customers remember where they saw the product, not that consumers identify any particular design feature with Plaintiff. The question also lists Plaintiff's websites for three out of nine of the answers – giving the survey taker a thirty-three percent chance of picking one of Plaintiff's websites. Based on these two questions, Schneer found that "[of] those familiar with Genesis Stylus Product, three in 10 (30%) said they saw the product on StyliSource.com while about one in 4 (24%) indicated seeing the product on StylusCentral.com."

These questions are not sufficient to show secondary meaning. First, the survey only questioned existing customers who are already familiar with Plaintiff's product and, thus likely

---

[4] In *Mark Bric Display Corp. v. Joseph Struhl Co., Inc.*, the Court noted that the individual conducting the survey, Dr. Jacoby, "[wa]s a thoroughly trained and experienced market researcher… and his survey methods and practices have been admitted by numerous courts throughout the country" when it determined that the survey was sufficient to demonstrate secondary meaning. 2003 WL 2169318 at *9 (D.R.I. 2003). The Court stated, "Dr. Jacoby swore under penalty of perjury that the survey was conducted within the seven-factor framework provided by the Federal Judicial Center's *Manual for Complex Litigation, Third*," to demonstrate that the survey should be considered methodologically sound. In this case, there is no evidence that Schneer has ever been admitted as an expert, nor has Plaintiff demonstrated that the survey is methodologically sound.

familiar with Plaintiff's websites. This is similar to *Bay State*, where the Court determined that the respondents associate 'Bay State' with 'Bay State Savings Bank.' 484 F.Supp.2d. at 205. The multiple choice nature of the questions in Plaintiff's survey – along with the words 'styli' and 'stylus' provided in the answers shows only that customers associate a stylus with the name 'stylisource' or 'styluscentral,' not that they directly associate the stylus with the single source that owned those websites.

The survey is further deficient because it utilizes an improper sampling of individuals. Schneer noted that an ideal sample would have been a "large enough sample of the general population that would buy these styluses," and further stated that an ideal sample would be "improbable, if not impossible" to obtain. Instead, Schneer questioned only customers of Plaintiff, rather than consumers generally. As explained above, a proper sample should include not just Plaintiff's own customers, but also potential customers of Plaintiff. Moreover, even considering all of the biases in this survey, no majority of costumers associated the stylus with a single source.

The survey is thus deficient because it uses an improper sample of the Plaintiff's customers and gives participants an approximately thirty percent chance of guessing Plaintiff as the source of the product. This is insufficient as a matter of law to establish secondary meaning; a fact finder could not rely on it to answer the question of whether consumers associate the aforementioned features of the stylus with a single source.

*b. Indirect Evidence*

Factors to be considered as indirect evidence of secondary meaning are: 1) the length and manner of the use of the trade dress; 2) the nature and extent of advertising and promotion; 3) the efforts to promote a conscious connection between the public, the trade dress, and the source; 4)

the products' established place in the market (possibly through continuous use in the market); and 5) proof of intentional copying. *Yankee Candle,* 259 F.3d at 43–44.

Plaintiff asserts that the stylus holder has been on the market for a total of seven and a half years, and that it spent "a large portion of its available resources" to promote the product and to obtain a "Top 10" placement in Google through "Search Engine Optimization." Plaintiff notes that its websites promoting the stylus holders have between 5,000 and 10,000 new visitors per month. They also state that the stylus holder market is a niche market which does not generate much competition and therefore its customers are sophisticated, know the market for stylus holders, and know Plaintiff as the chief distributor of stylus holders. Plaintiff also alleges that Defendants intentionally copied its product.

There is a dearth of evidence in the record to substantiate many of Plaintiff's assertions; for example the number of visitors on the website per month is mentioned for the first time in Plaintiff's Response Brief without a citation. There is no evidence to substantiate Plaintiff's assertion that the product shows up in the top ten results in Google, or that Plaintiff spent "a large portion of available resources" on this, or that such a placement is "difficult to obtain." There is no evidence on the record to substantiate Plaintiff's assertion that stylus holder customers are "sophisticated" with knowledge of the stylus market. Further, while Plaintiff may have introduced some circumstantial evidence to support a finding of secondary meaning, there is insufficient evidence to show that a customer would associate the stylus holder with Genesis Strategies, and therefore insufficient evidence of secondary meaning. *Yankee Candle*, 259 F.3d at 45. The information about the website visitors, provides, at best, circumstantial evidence that a consumer might associate a stylus holder with the website StyliSource.com or StylusCentral.com. Ultimately, "[p]roof of secondary meaning requires at least some evidence

11

that the consumer associates the trade dress with the source." *Yankee Candle,* 259 F.3d at 43–44. Plaintiff has not produced such evidence.[5] Plaintiff has, therefore, not demonstrated secondary meaning, and summary judgment is granted in favor of Defendants on Counts I and III.[6]

*Unfair Trade Practice in Violation of M.G.L. c. 93A s. 11 (Counts II & IV)*

Plaintiff bases its 93A claim on its claim for trade dress infringement. Since summary judgment will be granted on the trade dress claims, it must be granted on the 93A claims as well. A party will be liable under Chapter 93A if it engages in an "unfair method of competition" or an "unfair or deceptive act or practice." M.G.L.c. 93A, § 11. "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law." *Schwanbeck v. Federal–Mogul Corp.,* 31 Mass.App.Ct. 390, 578 N.E.2d 789, 803–04 (1991), *rev'd on other grounds,* 412 Mass. 703, 592 N.E.2d 1289 (1992).

Plaintiff relies on *Incase v. Timex*, a case that involved both a trade secret dispute and a contract dispute. 421 F.Supp.2d. 226 (D. Mass 2006). The Court in *Incase* allowed the Chapter 93A claim to continue because of the extraordinary circumstances surrounding the breach of contract claim along with the trade secret claim. *Id*. at 240 (noting that "neither a simple claim for breach of contract nor a claim for misappropriation of unprotected intellectual property, standing alone, can support a claim for violation of chapter 93A. In this case, however, the whole is greater than the sum of its parts."). Plaintiff has not pled a breach of contract claim; its Chapter 93A claim is based *solely* on the alleged trade dress infringement. As Plaintiff cannot establish its trade dress claims which are the sole basis for the Chapter 93A claims, it cannot

---

[5] The Court in *Yankee Candle* went on to explain that proof of the products' pervasiveness on the market is also insufficient to show secondary meaning, because that would lead to all products that perform well achieving trade dress protection. 259 F.3d at 43–44.

[6] As Plaintiff has failed to establish secondary meaning, this Court need not address the issue of likelihood of confusion.

prove these state law claims. *See National Nonwovens v. Consumer Products Enterprises*, 397 F.Supp.2d. 245, 259 (D. Mass. 2005) ("Plaintiff alleges unfair methods of competition under Mass. Gen. Laws ch. 93A. This claim is supported by the same elements as Plaintiff's federal claims: trademark infringement, copyright infringement, false designation of origin, unfair competition, and trade dress infringement. Since, as noted above, the supporting claims are without merit, Plaintiff's 93A claim also fails."); *Unleashed Doggie Day Care v. Petco Animal Supplies Store* No. 10-10742-DJC 2011 WL 6812642 (D. Mass. Dec. 28. 2011) (granting summary judge for the defendant because there was no trademark infringement and the 93A claim rested solely on the trademark infringement claims). Therefore, summary judgment is granted in favor of Defendants on Counts II and IV.

*Fraudulent Misrepresentation (Count V)*

To recover for fraudulent misrepresentation, under Massachusetts' law, Plaintiff must prove: 1) that Pitney Bowes made a false representation of a material fact with knowledge of its falsity for the purpose of inducing Plaintiff to act; 2) that Plaintiff relied upon the representation; 3. that Plaintiff's reliance was reasonable under the circumstances; and 4) that Plaintiff was harmed as a result of his reasonable reliance. *Rodi v. Southern New England School of Law*, 532 F.3d. 11, 15 (1st Cir. 2008).

Plaintiff alleges that Pitney Bowes ordered its stylus holder with the intent to copy the holder rather than order the 15,000 to 18,000 holders as it allegedly stated it would. Evaluating the evidence in the light most favorable to Plaintiff, there are sufficient facts in the record to create material issues of disputed fact at to these elements. On February 11, 2010, Pitney Bowes ordered fifty stylus holders online from Plaintiff. On that same day, Ryan Maddern, a product manager at Pitney Bowes, emailed Ezra Shim from ICSN asking him to source a stylus holder

"similar to" Plaintiff's stylus holder. The record further indicates that, after going back and forth with a potential manufacturer regarding the exact details, the manufacturer emailed Kevin Ko of ICSN on March 12, 2010 requesting "a custom sample to avoid any mistakes," and then the manufacturer ordered two stylus holders from Plaintiff. After receiving the stylus holders, ICSN made a mold to create its own set of stylus holders, and Pitney Bowes then placed all further orders for stylus holders through ICSN. From this, a jury could infer that Pitney Bowes ordered the stylus holders in order to copy them, while representing to Plaintiff an intent to purchase in bulk.

The facts also support Plaintiff's contention that it relied on Pitney Bowes' representation that it would order between 15,000 and 18,000 stylus holders. Plaintiff purchased 10,000 styluses, tethers, and caps to fulfill the order that it anticipated from Pitney Bowes, which would allow a reasonable jury to find that Plaintiff did rely on the statement by Pitney Bowes that it would purchase between 15,000 and 18,000 stylus holders.

The issue of the reasonableness of the plaintiff's reliance is generally an issue of fact, but a court may grant summary judgment if it determines that no reasonable jury could find the party's reliance reasonable under the circumstances. *Rodi*, 532 F.3d. at 15. The court must consider whether the "recipient is entitled to assume that a representation of fact material in affecting his decision to engage or not to engage in the particular transaction is honestly made unless its falsity is obvious to his senses, or *he has reason to know of facts which then make his reliance unreasonable*." *Cote v. Astra USA*, No. 962501J 1998 WL 1184110 at *4 (Mass. Supp. 1998). For example, in *Cote*, there was sufficient evidence to show that the plaintiff witnessed several instances of sexual harassment against her co-workers and thus the Court found her

reliance on the company's assertions that her claim was an isolated incident to be unreasonable. *Id.* at *1.

In this case, Plaintiff does not have such a direct knowledge of the falsity of Pitney Bowes' statement that it was going to purchase stylus holders in bulk. Moreover, Pitney Bowes did place an initial order for over 5, 000 stylus holders. It is also true that Plaintiff did not have a contract, nor did Pitney Bowes put its intention to order the 15,000 to 18,000 stylus holders into writing, despite numerous requests from Plaintiff. Nevertheless, this is not enough to show that Plaintiff knew or should have known that Pitney Bowes never intended to fulfill the order, nor that it was unreasonable for Plaintiff to believe that Pitney Bowes did intend to fulfill the order.

With regard to whether the Plaintiff sustained damages, the First Circuit has stated, "[i]t is universally agreed that in a case where after the buyer's default a seller resells the goods, the proceeds of the resale are not to be credited to the buyer if the seller is a lost volume seller-that is, one who had there been no breach by the buyer, could and would have had the benefit of both the original contract and the resale contract." *Teradyne v. Teledyne Industries*, 676 F.2d 865, 868 (1st Cir. 1982). Plaintiff could be considered a lost volume seller, and thus would have incurred damages due to Pitney Bowes' representation that it would buy between 15,000 and18,000 stylus holders. While Plaintiff was able to resell the 10,000 stylus holders that it produced in anticipation of Pitney Bowes' order, due to the nature of Plaintiff's business it would have sold those stylus holders anyway. There is evidence in the record that Plaintiff's customers place continual orders on a rolling basis due to the necessity of replacing stylus holders. These are orders that must continually be filled, and were filled regardless of Pitney Bowes' order. Because these orders are continually made, Plaintiff is entitled to the status of a lost volume

seller, and thus could be considered damaged even though it was able to resell the 10,000 stylus holders.

Plaintiff has established there are questions of fact regarding its claim of fraudulent misrepresentation; therefore summary judgment is denied as to Count V.

**Conclusion**

For the reasons stated above, Defendants' Motion For Summary Judgment (Docket No. 54) is *__granted__* in part and *__denied__* in part as follows: Summary judgment is granted in favor of Pitney Bowes on Counts I and II, summary judgment is granted in favor of ICSN on Counts III and IV, and summary judgment is denied as to Pitney Bowes on Count V.


SO ORDERED.

                                                     *__/s/ Timothy S. Hillman__*
                                                    TIMOTHY S. HILLMAN
                                                    DISTRICT JUDGE